UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   4/5/2024
```

EDWARD P. ADAMS,

            Plaintiff,

    -against-

CO-OP CITY DEPARTMENT OF PUBLIC
SAFETY, et al.,

            Defendants.

21-CV-2675 (DEH) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

    Plaintiff Edward P. Adams, who is proceeding *pro se*, seeks damages pursuant to 42 U.S.C. § 1983 from the Co-op City Department of Public Safety, the RiverBay Corporation, and five individual Co-op City police officers for unlawful search, excessive force, false arrest, and malicious prosecution, including fabrication of evidence. On February 20, 2024, plaintiff sat for deposition, as required by this Court's Order dated January 24, 2024 (Dkt. 193). At plaintiff's request, the deposition was conducted via Zoom. (*See* Dkts. 183, 189, 193.) It did not go smoothly. After approximately one and one-half hours of testimony, defendants' counsel contacted chambers in hopes of making an oral motion for judicial supervision of the remainder of the deposition. Upon learning that the Court was not immediately available, counsel resumed the deposition and attempted to complete it that day.

    Since then, the Court has received a total of ten discovery-related letters and letter-motions from the parties, most (though not all) related to plaintiff's February 20 deposition. Among other things, plaintiff has requested that the Court compel defendants to produce the "video of the zoom cloud recording" of his deposition testimony (a video that, according to defendants, does not exist); suppress his deposition transcript until the video is produced, and/or because it is inaccurate; and sanction defendants for sending him discovery materials through the mail rather than by email. Defendants, for their part, seek leave to continue plaintiff's deposition for a second day, under

judicial supervision. For the reasons that follow: (i) plaintiff's motions will be denied; and (ii) defendants' motion will be granted to the extent that they may continue plaintiff's deposition for a second day, and are directed to do so at the Daniel Patrick Moynihan United States Courthouse, where a member of this Court's staff can supervise the deposition and alert the Court if judicial intervention is required.

### **Background**

The deadline to complete all fact discovery, including depositions, is April 26, 2024. (Dkt. 169 ¶ 4.) Although plaintiff noticed the depositions of the five individual defendants, to take place from February 23-27, 2024 (*see* Dkt. 193 ¶ 2), he advised defendants' counsel during the first day of his own deposition that he was cancelling defendants' depositions. *See* Adams Dep. (Dkt. 212 at ECF pp. 2-392) at 84:5-87:17. Consequently, the only deposition noticed but not yet completed is plaintiff's.

Beginning the day after the initial session of plaintiff's deposition, the Court received:

 (1) a letter from defendants, dated February 21, 2024, advising (as relevant here) that they intended to make motion for additional time within which to complete plaintiff's deposition and for judicial supervision of the reminder of the deposition (Dkt. 204 at 1-2);

(2) a letter from plaintiff, also dated February 21, 2024, in which he (a) complained that defendants' counsel used the United States Mail to send him a flash drive containing body camera videos that he requested in discovery (instead of emailing him the videos, as he preferred); and (b) stated that, while he would "answer a few additional questions" as a "courtesy to the Court," in his view he had "fulfilled his obligation to the SDNY and completed a deposition" on February 20 (Dkt. 205 at 1-2);

(3) a letter from defendants, dated February 22, 2024, advising the Court that in the attachments to a previous letter-motion (Dkt. 201), plaintiff had "inappropriately omitted" the individual defendants' signed verifications of their interrogatory answers, causing the Court to conclude erroneously, in an order dated February 19, 2024 (February 19 Order) (Dkt. 202),[1] that they had not fully complied with Fed. R. Civ. P. 33 (Dkt. 206);

(4) a letter from plaintiff, also dated February 22, 2024, reporting that the flash drive sent to him via United States Mail was "stolen out of my mailbox" and that he would be "notifying Federal Authorities, NYPD of the entire scenario and sequence of events" (Dkt. 207);

(5) another letter from plaintiff, also dated February 22, 2024, advising that he would provide additional updates concerning the alleged tampering with his mail as he received information from the "United States Postal Police," who are "on the trail regarding [counsel's] UNAUTHORIZED mail delivery" (Dkt. 208 at 1);

(6) a letter-motion from defendants, dated February 26, 2024, in which they (a) attached a copy of the rough draft transcript of plaintiff's February 20 deposition, which lasted six hours and 25 minutes (inclusive of breaks), as well as various emails between plaintiff and counsel; (b) explained that although the deposition was conducted via Zoom, it was not video-recorded; (c) requested leave to conduct a second session of plaintiff's deposition beyond the 7 hours authorized by Fed. R Civ. P. 30(d)(1); (d) requested that the resumed deposition be supervised by "a judicial hearing officer or a court referee"; and (e) asked for unspecified assistance in curbing plaintiff's pattern of accusing defendants' counsel of various species of wrongdoing and "threatening to report the undersigned to the FBI and the NYPD" (Dkt. 209 at 1-2);

---

[1] *Adams v. Co-op City Dep't of Pub. Safety*, 2024 WL 687275, at *2 (S.D.N.Y. Feb. 19, 2024).

(7) a responding letter from plaintiff, also dated February 26, 2024, in which he (a) insisted that his deposition must have been video-recorded; (b) objected to "the admissibility of any transcript from the deposition" until defendants' counsel produced "the video of the zoom cloud recording"; (c) threatened to "forward [defendants' counsel] and [the court reporter] over to Federal Authorities" and "seek additional remedies," which he did not specify; and (d) requested that "anything PRIVILEGED be removed from the record." (Dkt. 210, at ECF pp. 1-2.)

On February 29, 2024, the Court directed defendants to submit the final version of plaintiff's deposition transcript when available, and advised the parties that it "does not require and will not accept any further letter-motions or briefs regarding the conduct of the deposition." *See* Feb. 29 Order (Dkt. 211) at 1.[2] On March 18, 2024, defendants filed "the finalized and official transcript of the Plaintiff's deposition testimony." (Dkt. 212 at 1.) Over the next three days, the Court received:

(8) a letter-motion from plaintiff, dated March 20, 2024, in which he (a) advised the Court that he "will be formally moving to suppress the pro se plaintiff's remotely taken deposition" pursuant to Fed. R. Civ. P. 32(d)(4) because "[r]emote depositions via zoom are in fact cloud based recordings," but no video was "made available for inspection to the plaintiff"; (b) asserted that the final transcript of his February 20 deposition is "inaccurate, inadmissible, and poorly transcribed," in that it contains "retard wording and statements I DID NOT actually say"; and (c) refused to review the final transcript or submit a statement listing his proposed changes and reasons for making them, in accordance with Fed. R. Civ P. 30(e), because – he explained – he previously sent defendants' counsel an errata sheet "as to the rough text," and believes that counsel should apply those corrections "to her paperwork (VERBATIM)" (Dkt. 213 at ECF pp. 1-2);

---

[2] Contrary to plaintiff's apparent belief (*see* Dkt. 219-1 at 1), defendants' letter-motion for leave to extend his deposition was not resolved in the Court's February 29 Order. It is resolved in this Order.

(9) another copy of plaintiff's March 20, 2024 letter-motion, under cover of a letter dated March 21, 2024, clarifying that he was requesting a "Rule 37.2" conference as to the deposition transcript (Dkt. 214); and

(10) a letter from defendants' counsel, dated March 21, 2024, opposing plaintiff's suppression motion and requesting that plaintiff be sanctioned "for his continued pattern of abuse towards not only the judicial process but towards defense counsel as well." (Dkt. 215.)

Most recently, on April 2, 2024, the Court received a status letter in which defendants advised the Court that plaintiff has agreed to review and submit any changes to the final transcript of his February 20 deposition testimony by April 11, 2024. (Dkt. 219.)

The parties' various disputes are resolved as set forth herein.

### Service of Discovery Materials

The Court construes plaintiff's letters at Dkts. 205 and 207 as a motion to sanction defendants for sending him discovery materials via United States Mail, and DENIES that motion. Rule 5(b)(2) governs the service of litigation documents, including discovery responses. The rule authorizes service by a variety of methods, including by mail "to the person's last known address." Fed. R. Civ. P. 5(b)(2)(C). Service may also be made by "any other means that the person [to be served] consented to in writing[.]" Fed. R. Civ. P. 5(b)(2)(F). Here, the parties agreed, during the initial case management conference, to accept service by email. That agreement *enlarged* the permissible methods of service. It did not *prohibit* service by mail (or by any of the other methods authorized by Rule 5(b)(2)). Nor did this Court's Initial Case Management Order (Dkt. 169) prohibit production of discovery materials by mail. Consequently, when defendants' counsel mailed the body camera videos to plaintiff on a flash drive – after trying but initially failing to send them via email – her conduct was neither "unauthorized" nor in any other way improper.

If plaintiff has concerns about the security of his home mailbox, he may wish to obtain a P.O. box at his local post office or make other arrangements to receive discovery materials that cannot easily be emailed.

## Alteration of Exhibits

Plaintiff's letter-motion at Dkt. 201, filed February 16, 2024, attached copies of the individual defendants' recently-served interrogatory answers, but omitted their signed verifications, which caused this Court to believe that the answers were unverified. Consequently, in its February 19 Order (at 3-4), the Court directed defendants to verify their interrogatory answers. Thereafter, defendants corrected the record by submitting their signed verifications, bearing dates from February 6 through February 14, 2024. (Dkt. 206-1.)

Plaintiff is hereby advised that it is wholly improper to redact, modify, shorten, edit, or otherwise alter a document submitted to the Court **without clearly disclosing the nature of the alteration**. Given that one of plaintiff's allegations in this action is that defendants introduced "doctored paperwork" in the underlying state court criminal proceedings (*see*, *e.g.,* Dkt. 116 at ECF p. 1; Dkt. 119 at ECF p. 3; Dkt. 199-1; Adams Dep. at 10:9-10, 12:14-15, 91:3, 146:4-5, 174:2-3, 184:13-14, 185:4, 7, 10, 186:13, 17, 21, 187:10-11, 190:17, 192:11, 197:15, 23, 198:3-4, 203:6, 237:5, 263:16-17, 290:24, 298:23), the Court expects him to appreciate the significance of this issue. In the future, should plaintiff submit an altered document to the Court without disclosing the nature of the alteration, **the Court will not hesitate to impose sanctions**.

## Video Recording of Deposition

The Court construes plaintiff's letter at Dkt. 210 as a motion to compel the production of a video recording of his February 20, 2024 deposition testimony and DENIES that motion, primarily because plaintiff has offered nothing but speculation to support his claim that defendants possess

such a recording. Although it is of course possible to make a video recording of a remote deposition, the Federal Rules of Civil Procedure do not require it. Nor does the technology used for remote depositions automatically create such a record.[3] As the court explained in *Alcorn v. City of Chicago*, 336 F.R.D. 440 (N.D. Ill. 2020), "[a] videoconference deposition is not the same as a video-recorded deposition. The former uses remote technology to conduct a deposition; the latter records and preserves the deposition in video format that could one day serve as a substitute for live testimony." *Id.* at 444.

Rule 30, governing depositions, authorizes the party noticing the deposition to determine whether it will be recorded "by audio, audiovisual, or stenographic means," Fed. R. Civ. P. 30(b)(3)(A), and requires that party to pay the costs associated with the chosen method. *Id.*; *see also* Order dated Jan. 9, 2024 (Dkt. 188), at 2 ("The party noticing a deposition is ordinarily entitled to determine when, where, and by what means the deposition will be conducted."). On receipt of a deposition notice, the opposing party "may designate another method for recording the testimony in addition to that specified in the original notice," Fed. R. Civ. P. 30(b)(3)(B), but will then be responsible for "the expense of the additional record or transcript." *Id.*[4] Thus, while the Federal

---

[3] On the Zoom platform, an electronic recording may be made using Zoom's built-in recording capability, and saved either locally or to "the cloud." According to Zoom, however, such a recording cannot be made surreptitiously. Rather, all participants are notified that it is being made by means of a red light, which appears "in the upper left corner of [their] Zoom window with the words 'Recording.'" *See* Zoom Support, "Getting started with recording on Zoom," https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0059856 (last visited April 5, 2024).

[4] These rules apply to in-person and remote depositions alike, and result in a deposition transcript and/or recording that is certified by a qualified deposition officer pursuant Fed. R. Civ. P. 30(f)(1). When a deposition is recorded by the traditional "stenographic means," a professional court reporter, who also serves as an "officer appointed or designated under Rule 28," *see* Fed. R. Civ. P. 28, 30(b)(5)(A)), attends the deposition, takes stenographic notes, and prepares the transcript based on those notes. After giving the deponent 30 days to review the transcript and list any changes, *see* Fed. R. Civ. P. 30(e)(1), the stenographer "must certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony." Fed. R. Civ.

Rules of Civil Procedure permit a party to have a video recording made of a Zoom deposition, they do not require it.

In this case, defendants' Notice to Take Deposition upon Oral Examination (Dkt. 185) advised plaintiff that his deposition would be taken "before a Notary Public or other duly qualified officer" at a court reporting agency. Defendants later agreed, at plaintiff's request, to conduct the deposition remotely. (*See* Dkts. 183, 189, 193.) Although defendants' notice did not specifically state that the testimony would be recorded by stenographic means, neither did it promise any other recording method. If plaintiff wished to ensure that a video recording was made, he could and should have made that request to defendants' counsel in advance and then (if defendants were not willing to bear the cost) cross-designated the deposition himself, pursuant to Rule 30(b)(3)(B), and made arrangements with "a certified videographer who has the appropriate training to serve as the Rule 28 officer" to make and certify the video record. *Alcorn*, 336 F.R.D. at 443.[5]

---

P. 30(f)(1). Similarly, when a party notices a deposition to be recorded by audiovisual means, a professional videographer, who also serves as an "officer appointed or designated under Rule 28," attends the deposition, records the testimony, and prepares the recording. The videographer must also ensure that "[t]he deponent's and the attorneys' appearance or demeanor" are not "distorted through recording techniques." Fed. R. Civ. P. 30(b)(5)(B). After giving the deponent 30 days to review the recording and list any changes, the videographer "must certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony." Fed. R. Civ. P. 30(f)(1). "These procedures are designed to ensure that a neutral individual administers the oath and that the deposition is an accurate reflection of the witness's testimony. It removes doubt as to whether a recording or transcript has been tampered with or edited by either party. The process also maintains the integrity of the deposition, which can involve managing changes to the transcript, custody of the deposition materials, and appearances on video." *Alcorn*, 336 F.R.D. at 442.

[5] In *Alcorn*, 336 F.R.D. at 441-44, the court held that an uncertified deposition recording, made informally by a party "using the Zoom record function," would be inadmissible as evidence, because it was not made and certified by the Rule 28 officer as required by Rule 30. "Nothing in Rule 30 allows a party to engage in a secondary recording or transcription of a deposition, and treat that recording as the equivalent of a certified deposition." *Id.* at 443; *see also Ryan v. eXp Realty LLC*, 2022 WL 475988, at *2 (D. Ariz. Feb. 16, 2022) (unofficial Zoom recording of defendant's deposition, made by plaintiff, was inadmissible at trial because, among other things, it was not made by a "certified videographer"); *Carvalho v. Reid*, 193 F.R.D. 149, 152 (S.D.N.Y.

The Court cannot require defendants to produce a video recording that does not exist. Nor can the Court penalize them for failing to retain a videographer and pay for a certified recording of the deposition when Rule 30(b)(3) did not require them to bear that expense. There is thus no basis on which the Court could grant plaintiff's motion to compel production of the "cloud based video recording" (Dkt. 213 at ECF p. 2) of his February 20 deposition testimony.

### Suppression of Deposition Transcript

The Court construes plaintiff's letters at Dkts. 210, 213, and 214 as a motion to suppress his deposition transcript on the ground that the transcript is inaccurate, and DENIES that motion, because plaintiff makes no showing of any inaccuracies that he could not adequately identify and address pursuant to Rule 30(e)(1). Plaintiff tells the Court that the final version of his deposition transcript, which he received from defendants' counsel on March 12, 2024, is "inaccurate, inadmissible, and poorly transcribed" (Dkt. 213 at ECF p. 1), explaining that it contains "retard wording and statements that were NOT actually cited by the plaintiff" (*id*. at ECF p. 2), including "[w]ords that couldn't have even mistakenly been heard as to the typing by the court reporter." (*Id*. at ECF pp. 2, 3.) However, plaintiff does not provide even a single example of any actual inaccuracy in the final transcript.

To the contrary: at least until recently, plaintiff has refused to review and note corrections to that transcript (which he has 30 days to do under Rule 30(e)(1)) on the ground that he should not be required to make the effort after previously reviewing the rough draft transcript and sending

---

2000) (noting denial of *pro se* plaintiff's request to videotape her own deposition "for failure to provide proper notice to the defendant, as required by Rule 30(b)(3) . . . , and for failure to arrange to have the videotaping conducted by an appropriate person, as required by Rules 30(b)(4) and 28(c)").

defendants' counsel "20 pages of corrections (errata sheet) as to the rough text." (Dkt. 213 at ECF p. 2.)[6] In an email to defendants' counsel dated March 13, 2024, plaintiff explained:

> [W]e gave you those corrections already. You should apply those corrections to your paperwork. I shouldn't have to go over 300 plus pages of paperwork again and do more corrections. That would take up a substantial amount of my time. That's me doing homework (burdensome). I have my own motion to work on. So before you present it [the final transcript] to me, you should apply the 20 plus pages + affidavit of corrections I gave you to the rough text[.]

(Dkt. 213-4 at ECF p. 8.) In his letter-motion, as in his correspondence with opposing counsel, plaintiff takes the position that counsel must "apply the 20 plus pages of corrections" that he previously provided "to her paperwork (VERBATIM)." (Dkt. 213 at ECF p. 2.)

Plaintiff misunderstands the review process set forth in Rule 30(e)(1). That rule gives a deponent the *opportunity* to review his deposition transcript and submit a statement listing any "changes in form or substance," along with "the reasons for making them." Fed. R. Civ. P. 30(e)(1)(A)-(B). The statement goes to the deposition officer, who must "note in the certificate prescribed under Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period." Fed. R. Civ. P. 30(e)(2). If the deponent waives his right to review and make changes to his deposition transcript during the prescribed 30-day period, the officer may certify the transcript as is, and any later attempt to contest its accuracy will likely be rejected. *See, e.g.*, *Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 330 n.3 (E.D.N.Y. 2021) (collecting cases); *Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 50 (N.D.N.Y. 2009) ("This rule applies even to *pro se* litigants.") The Court, however, has the discretion to extend a deponent's time to review the transcript. *See*, *e.g.*, *Wilson v. Calderon*, 2016 WL 3522206, at *1 (S.D.N.Y. June 16, 2016).

---

[6] Plaintiff's' proposed corrections to the rough transcript are dated February 27, 2024, and are attached to his March 20, 2024 letter-motion. (Dkt. 213-6.)

If the deponent does make changes, the officer is required to "attach" them, Fed. R. Civ. P. 30(e)(2), but is not required or permitted to alter the transcript itself. "There is a requirement that the changes not delete the original testimony, since both are admissible at trial." *Allen & Co. v. Occidental Petroleum Corp.*, 49 F.R.D. 337, 340 (S.D.N.Y. 1970); *see also Express Freight Sys. Inc. v. YMB Enterprises Inc.*, 2022 WL 2467176, at *5 (E.D.N.Y. Mar. 29, 2022) ("The language of the Rule does not permit the deponent to rewrite or alter his testimony or prevent an opposing party from using it later in the proceedings. When an errata sheet is attached to a deposition, an opposing party 'nevertheless remain[s] able to utilize the original answer provided by [the deponent], and they will have the opportunity to impeach [the deponent] at trial with any inconsistencies[.]'"), *adopted,* 623 F. Supp. 3d 39 (E.D.N.Y. 2022) (citations omitted). Moreover, if the changes are substantial, they may give the opposing party "a right to reopen the deposition and further cross-examine the witness." *Allen & Co.*, 49 F.R.D. at 341; *accord Desulma v. City of New York*, 2001 WL 798002, at *4 (S.D.N.Y. July 6, 2001); *Hlinko v. Virgin Atl. Airways*, 1997 WL 68563, at *1 (S.D.N.Y. Feb. 19, 1997) (reopening plaintiff's deposition "for cross-examination on the substance of the changes, as well as plaintiff's reasons for making them").

It is of course up to plaintiff whether to perform the work required to review the final transcript of his February 20 deposition and submit any changes. But nothing in the Federal Rules of Civil Procedure exempts a deponent from doing that because he previously chose to review a transcript that he *knew* to be a rough draft, and – predictably – found errors in that rough draft. Nor is there any basis for plaintiff's request that this Court require opposing counsel to do his work for him.

It now appears, based on his defendants' most recent status letter, that plaintiff has reconsidered his earlier refusal and has agreed to submit any proposed changes to the final

transcript of his February 20 deposition by April 11, 2024; that is, within 30 days after he received

that transcript (Dkt. 219 at 2.) Plaintiff is advised that should he neglect to submit any changes by

this date, in accordance with Fed. R. Civ. P. 30(e)(1)(A)-(B), he will have waived he right to do

so. *See Jeter v. New York City Dep't of Educ. of City of New York*, 2012 WL 2885140, at *1

(E.D.N.Y. July 13, 2012) (disregarding objections to deposition transcript first raised in opposition

to summary judgment motion).[7]

### Extension of Plaintiff's Deposition

Rule 30(d)(1) requires the court to extend a deposition, beyond the presumptive 7-hour

limit set forth therein, if the deponent "impedes or delays the examination," or if (for any reason)

additional time is needed to "fairly examine the deponent." Fed. R. Civ. P. 30(d)(1). A district

court has "broad discretion" to determine whether these conditions have been met. *Umbach v.

Carrington Inv. Partners (US), LP*, 2012 WL 4854657, at *1 (D. Conn. Oct. 11, 2012). The court

may also impose sanctions on a party or witness found to be responsible for impeding or delaying

the deposition. Fed. R. Civ. P. 30(d)(2).

Rule 30(d)(1) and (d)(2) motions are frequently granted where the deponent wastes time

fencing with the examiner instead of answering unobjectionable questions. *See*, *e.g.*, *Parchem

Trading Ltd. v. DePersia*, 2018 WL 11468670, at *3-4 (S.D.N.Y. Dec. 27, 2018) (extending

deposition, and imposing sanctions, where deponent behaved in a "quarrelsome and disagreeable

---

[7] To the extent plaintiff seeks to suppress "anything PRIVILEGED" in the February 20 transcript
(Dkt. 210 at ECF p.1), that branch of his motion is also DENIED. Plaintiff has not identified any
privileged material in the transcript. Instead, he contends that the testimony he provided
concerning his "medical research volunteer work" (he was apparently paid to enroll in drug trials)
should be excised as "confidential." (*Id*. at ECF pp. 1-2.) However, he has provided no
substantiation, beyond his own say-so, that the *fact* of his participation in those trials is subject to
any confidentiality restriction. Moreover, plaintiff did not identify any specific drugs, much less
specific trials, during his deposition. In the event that he is required to disclose more detailed
information (in connection with his damages claim for lost income), any genuine confidentiality
issues can no doubt be resolved through an appropriate protective order.

manner" and responded to questions in a hostile and evasive manner by, among other things, telling the examiner to "look it up," because "I'm not doing your work for you"). Similarly, where a deponent makes lengthy and argumentative objections, or improperly refuses to answer questions on relevance grounds, in contravention of Rule 30(c)(2),[8] the deposition may be extended and the deponent may be compelled to answer those questions. *See*, *e.g.*, *Scott-Iverson v. Indep. Health Ass'n, Inc.*, 2017 WL 35453, at *3 (W.D.N.Y. Jan. 4, 2017) (compelling further testimony where "the record demonstrates that Plaintiff's repeated refusals to answer Defendant's questions at issue are based on Plaintiff's opinion that the questions did not seek relevant information"). Relief under Rule 30(d) is also warranted where, although the deponent "ultimately answered" counsel's questions, "the path to those answers was often unnecessarily circuitous or contentious" because the witness insisted on "interpos[ing] lengthy narratives, sometimes expressing her views on the relevance of the question or impugning the objectives or motives of counsel," before providing any substantive response. *Murphy v. Maggs*, 2024 WL 884992, at *5 (W.D.N.Y. Mar. 1, 2024).

In this case, plaintiff Adams utilized all of the delaying techniques sketched above, often in combination. For example, at the outset of the deposition, defendants' counsel asked plaintiff a simple and narrow question: whether he was "in receipt of the entire criminal court transcripts" regarding two of the criminal indictments at issue in this case. Adams Dep. at 9:23-25. In response, Adams recapitulated the theory of his case, explained how (in his view) the transcripts supported

---

[8] Rule 30(c)(2) provides that objections must be stated "concisely in a nonargumentative and nonsuggestive manner," and "noted on the record," but "that the examination still proceeds; the testimony is taken subject to any objection." Fed. R. Civ. P. 30(c)(2). It is thus well-settled that it is improper for a witness to refuse to answer a deposition question, or for an attorney to "instruct a witness not to answer a question," on the basis of "relevance." *In re Omeprazole Patent Litig.*, 2005 WL 818821, at *11 (S.D.N.Y. Feb. 18, 2005); *see also Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 307 (S.D.N.Y. 2019); *Baines v. City of New York*, 2016 WL 3042787, at *5 (S.D.N.Y. May 27, 2016); *Weinrib v. Winthrop-University Hosp.*, 2016 WL 1122033, at *2 (E.D.N.Y. Mar. 22, 2016).

his case, but refused to produce them, advising counsel instead to "go down to the district attorney

who you conspired with and you could get the copies from them," or from "the feds," to whom he

had previously reported defendants' alleged misconduct:

A.    I am not in receipt of every single item or every single page -- pardon. I am not in receipt – some of the testimony that they gave, I have already forwarded to the feds –

Q.    Well, Mr. Adams –

A.    – over a year ago, maybe. Of course, hang on, this case concerns doctored paperwork. So pertaining to what I have, it might be better to even reach out to who they brought the indictment down with, basically their co-conspirators. Because it would be burdensome for me to even come up with 2,000 or 3,000 pages.

Q.    Listen to the question I am asking you. We will get through this a lot quicker – don't worry, I am going to give you an opportunity to testify as to your claims.

A.    It is not a story, it is what happened. Your client's testimony, it is what happened. It is not me. I am not a madman here, perjury, perjury, this is transcribed you guys got on the stand, they testified under oath. I am not a madman. That's what the transcripts are for. The transcripts are to hold the people accountable for what is said and done under oath.

Q.    I am not saying that, I just need to know what transcripts. You only sent me some transcripts, I am just going to make a demand on the record for all the transcripts you are in possession of, copies of all those transcripts, I am entitled to that.

A.    You could make your demand, but like I responded to you within the interrogatories request, the testimony is available from a more convenient, less expensive source, which is their co-conspirators, the district attorney. Just go down to the district attorney who you conspired with and you could get the copies from them. Or you could contact the feds. Contact the feds and ask them about the testimony. You are not going to burden me, a pro se litigant, to come up with 2 or 3,000 pages. That's insane.

Q.    How many pages are you in possession of?

A.    I don't know exactly how many pages I am in. What I gave up, I actually – listen, there is other guys. You got Gario. You got other guys that came on with them, that I didn't even forward that testimony, because that's not – those guys didn't perjure themselves, you understand. And that was not the basis of this claim. The basis of this claim a doctored wanted poster which

was inserted into evidence on May 20, '21. That's what I forwarded. And additional perjury violation that your client, Charles Thomas, actually I could have –

Q.    Mr. Adams, I am going to stop you right there. We are getting offtrack. I am going to let you testify as to the claims, I am just asking you a specific question.

MS. BENEDETTO [defendants' counsel]: Move to strike everything that is not responsive.

*Id.* at 10:2-12:25. A few minutes later, counsel asked another simple question – an individual's name – only to be met with resistance to the question, followed by a lengthy, stream-of-consciousness aside about the future lawsuit that plaintiff is apparently planning to bring against that individual:

Q.    It is a simple question, what individual are you referring to?

A.    I am referring to the complainant's youngest daughter.

Q.    Who is that?

A.    That's the mother of my children.

Q.    I need the name.

A.    Well, she is not part of the case.

Q.    I need her name, Mr. Adams.

A.    Her name is Amber Hinestroza. I am sure – ask your clients about her name. You are asking me her name like you don't know her name. You know my name.

Q.    You are here to answer my questions. If you have an issue with my questions –

A.    You are asking me my name.

Q.    I am entitled to ask you questions regarding this claim and you have to answer them.

A.    Yes.

Q.    Is that also Quira Hinestroza?

A.     Hang on, since you brought up her, she actually perjured herself too. I will handle her shortly after this litigation is done. But this is a process, you understand. So your guys are up first. I am going to close your case out, and then I will have to move onto my children, unfortunately, after that. But this is a process. This is high corruption in this case. This case – actually, the corruption with your clients in the Bronx ADA, which is transcribed, this actually spills over into the family sector, because they actually threw the case to remain in accordance with the ADA and your clients. Of course I was acquitted on all accounts by a jury of 12.

*Id*. at 13:8-14:22. When counsel asked Adams to "[j]ust answer my question," he insisted that he

could not do that because:

This is like a soap opera. So I have to give the context of everything, I can't just give you a piece of what is going on. I got to give you everything, because one person leads to another person, the complainant. She is tied to your clients and the ADA, you understand. So this is a puzzle. Do you understand? So I have to put the puzzle together, which is all transcribed, if you want me to prove the pregnancy, that's not related to this claim. I do have children with the complainant's daughter.

*Id*. at 15:4-16.

Thereafter (still within the first hour of the deposition), plaintiff testified that he had "taken

a plea," Adams Dep. at 39:18, but refused to provide any further information about his guilty

plea(s) because, in his view, that information was "beyond the scope," *id*. at 43:7-8, and likewise

refused to provide the addresses he lived at prior to his current address, because, in his view, that

information was not relevant to his case. *See id.* at 49:5-51:15. Thereafter, when counsel expressed

frustration because plaintiff was "going on and on and on" in response to simple yes or no

questions, and stated that she was going to "call the court," *id*. at 81:4-82:13, plaintiff volunteered

his analysis of her legal skills and ethics, as compared to the attorney who originally represented

defendants in this action:

THE WITNESS: . . . I am going to tell you something, the other guy that was defending them, that guy, in my opinion, was a reputable attorney because he knew not to stand too close to them, which was Joe Saccomano, Jr., which is actually why he filed for a judgment on the proceeding back on 1/30 and back on 1/24. He knew not to stand too close to those guys. I know

> they are probably paying you a pretty penny, but you want to maintain your license when you are defending people like this, just for the whole mighty dollar, it is not worth ethics. There is a code of ethics with everything. Some of the worse guys you ever heard of, there is a code of ethics involved.

*Id*. at 82:19-83:12.

As noted above, the Court was not immediately available to rule on defendants' request for a supervised deposition, and counsel elected to continue the questioning. Adams Dep. at 84:7-8. Plaintiff's conduct, however, did not improve. Although some relevant testimony was provided over the course of the afternoon, the transcript also reflects that plaintiff frequently interrupted the examiner,[9] and continued to indulge in lengthy off-topic speeches and asides.[10] Later in the afternoon, he refused to answer a series of questions about his "allegations" and "claims," because, in his view, they were no longer "allegations" or "claims"; they are "facts" that he has "already proved." *See*, *e.g.*, *id*. at 192:8-194:13, 218:9-24, 265:6-16, 266:7-8, 278:2-6. Additionally, plaintiff continued to impugn counsel's ethics, repeatedly suggesting that she has been corrupted

---

[9] For example, after the deposition resumed, plaintiff would not permit defendants' counsel to place on the record the outcome of the call to the Court without multiple interruptions, during which he admonished counsel not to "lie," Adams Dep. at 88:3, and attempted to recharacterized the issues. *See id*. at 88:7-10 ("I am not refusing to answer questions. I am not answering questions beyond the scope. So say the right thing.").

[10] For example, plaintiff volunteered – with no question pending – a description of various potential claims against defendants that are *not* part of this case. Adams Dep. at 88:22-89:6 ("The case is not based on cyber hacking, it is not based on stalking. It is not based on me getting ambushed by two random men and then I stopped the guy, eleven days post acquittal, stopped them by TKO, one of the guys. That's not pertaining to this claim, though, I am not suing them for that."). Later in the day, he volunteered that the defendants are "being sued" (presumably by other plaintiffs) "for a litany of other shit, sorry. Excuse my language. Stuff that is not even related to this claim, violation of privacy. These people are hacking into your devices. They are out of their minds. Why, because I exposed them on the record pertaining to two bogus indictments. And that's not alleged, that's a fact." *Id*. at 196:3-11. This was in response to a series of questions in which defendants' counsel attempted to elicit from the plaintiff all of *his* contentions as to what exactly was "fabricated" on a "wanted poster" used in connection with one of his underlying prosecutions. *Id*. at 194:14-197:21. After three pages of back-and-forth, plaintiff finally conceded that he could not "prove" that anything was "doctored" on the flyer other than the date. *Id*. at 197:17-25.

by her association with the defendants she represents, *see*, *e.g.*, *id.* at 195:20-25 ("I am sure they are paying you a good amount, but for the almighty dollar, you would be lucky to keep your license ever defending people like this."), and from time to time engaged in childish displays of disrespect, such as in the following example:

> Q.  And you are referring to the document that shows you were arrested on August 10 of 2017; right?
>
> A.  Ding, ding, ding, ding, ding.
>
> Q.  Is that a yes?
>
> A.  Yes.

*Id.* at 200:12-24.

Due primarily to plaintiff's combative responses to unobjectionable questions, his repeated refusal to answer questions based on his own idiosyncratic view of relevance, and his insistence on cluttering the record with off-topic asides, answers to questions never asked, and mid-deposition critiques of the examiner's legal abilities and ethics, defendants were unable to complete his deposition in the six-plus hours devoted to the attempt on February 20, 2024. Defendants complain, in particular, that they were unable to examine plaintiff as to two of the arrests underlying this action (on March 25, 2018 and March 20, 2020) or complete their questioning relating to his claimed damages. I therefore conclude not only that plaintiff has impeded and delayed the examination, but that, as a result defendants require additional time to "fairly examine" him. Fed. R. Civ. P. 30(d)(1).

I have further determined that, in order to ensure that the second session of plaintiff's deposition is productive, it will take place in the courthouse, on a day when the Court is available to intervene if necessary. *See Black v. Buffalo Meat Serv., Inc.*, 2018 WL 3213288, at *10-11 (W.D.N.Y. June 29, 2018) ("The idea here is to have a non-contentious completion of this

deposition. If trouble does arise, Chambers of the undersigned are a telephone call away."); *Palmer v. Penfield Cent. Sch. Dist.*, 2015 WL 1038120, at *4 (W.D.N.Y. Mar. 10, 2015) ("Considering the nature and tone of the allegations made in the pending motions . . . this Court . . . will exercise its supervisory authority over discovery to require that plaintiff's continued deposition occur in the Courthouse before an independent court reporter to be hired by defendant."); *Matter of Subpoena, dated Oct. 2, 1987 issued to: Painwebber Inc.*, 117 F.R.D. 352, 353–54 (S.D.N.Y. 1987) ("This seems to be the only way to put an end to excesses.")

Unfortunately, the federal district courts do not have judicial hearing officers or court referees available to assist in supervising discovery. (*See* Dkt. 209 at 1-2.) I agree, however, that supervision is appropriate, and will assign a member of my chambers staff to perform that task, to provide guidance to the parties if necessary, and to alert me in the event that neither the setting nor the guidance produces acceptable deposition conduct. *See Marseet v. Rochester Inst. of Tech.*, 2023 WL 533288, at *3 (W.D.N.Y. Jan. 27, 2023) (noting that a deposition involving a difficult party took place under the supervision of "the Court's law clerk").

## <u>Civility – Part II</u>

Much of plaintiff's March 20, 2024 letter-motion is devoted to his recapitulation of the many alleged discovery and scheduling violations he previously accused defendants' counsel of committing in this action (none of which resulted in any finding of impropriety by this Court). Plaintiff's letter-motion also includes a variety of ill-tempered *ad hominem* attacks on counsel, whom he describes as a "lying lawyer" who has the "all too familiar 'stench' of her clients" and whose "ethics are in the basement (figuratively speaking)." (Dkt. 213 at ECF p. 2-3.) Plaintiff expressed similar sentiments in his email correspondence with counsel, stating at one point that he

had caught her "red handed, hands in the cookie jar" (Dkt. 209-2, at ECF p. 5),[11] and at deposition, where he baselessly accused her of lying. *See* Adams Dep. at 88:3.

The Court has previously warned plaintiff that *pro se* parties, like attorneys and represented parties, are "expected to conduct themselves courteously [and] to communicate in a professional and civil manner[.]" Parties who resort to profane, insulting, or abusive language . . . risk significant sanctions." Order dated February 2, 2024 (Dkt. 200) at 4.[12] Plaintiff's belief that his rights were violated by the law enforcement officers he has named as defendants does not permit him to insult their counsel or pepper her with baseless claims of unethical and/or criminal conduct. *Id*. This is plaintiff's last warning. Should he persist in his *ad hominem* attacks on counsel, sanctions will be assessed.

## Conclusion

For the reasons set forth above, plaintiffs' requests and/or motions for sanctions, for an order compelling defendants to produce the "video of the zoom cloud recording" of his February 20, 2024 deposition, and for an order suppressing the transcript of that deposition in whole or in part (Dkts. 205, 207, 210, 213, 214) are DENIED.

Defendants' Rule 30(d)(1) motion for leave to conduct a second session of plaintiff's deposition under supervision (Dkt. 209) is GRANTED. The deposition shall be conducted in the jury room annexed to Courtroom 20A in the Daniel Patrick Moynihan United States Courthouse, under the supervision of a member of the Court's staff, on one of the following dates: April 11,

---

[11] Insofar as the Court can determine, plaintiff was suggesting that it was somehow unethical for counsel to send him a rough deposition transcript, clearly marked as such, before the final was available.

[12] *Adams v. Co-op City Dep't of Pub. Safety*, 20224 WL 402856, at *2 (S.D.N.Y. Feb. 2, 2024).

April 18, April 19, April 24, or April 26, 2024. The parties may jointly telephone chambers to confirm the selected date.

All relief not expressly granted herein is DENIED.

The Clerk of Court is respectfully directed to close the motions at Dkts. 213 and 214.

Dated: New York, New York
      April 5, 2024

**SO ORDERED.**

_____

**BARBARA MOSES**
**United States Magistrate Judge**